Okay, let's move to our second case this morning, which is Sunrisa Holdings v. Circle K, 19-1333. Mr. Weiner, you're up first. May it please the court, I represent Sunrisa Holdings, Jean Lucero, and Melody Ortega. Thank you for granting my motion that allowed me to save time using Zoom by showing you one of the exhibits or giving you an exhibit from the record. And Mr. Giron suggested I actually hold it up, but if you have access to the appendix, it's found at 1041. So to recap factually, Circle K spilled gasoline in 2011 at their gas station next door to plaintiff's property. And Circle K's remediation company told plaintiffs about it three years later in 2014, when plaintiffs were in the midst of selling their property to Trammel Crow, a developer who insisted the sales price be reduced by up to $300,000 to put into an escrow for environmental remediation. Ultimately, $183,000 of this escrow was used by Trammel Crow for remediation projects it chose to undertake, specifically putting a vapor barrier over the contaminated groundwater, not dirt, but contaminated groundwater, and under the mixed residential commercial development on the surface. In dismissing the case, and this map here shows the Circle K gas station in the upper left-hand corner, and then my client's properties were combined and are in the gray, and you can see the plume of contamination came down and went onto my client's properties. In dismissing the case on summary judgment, after the witness list had been prepared and filed and entered in the First, he confused the damages that my clients incurred, which was the $183,000 reduction in the sales price. He confused that with the damages that Trammel Crow, the big developer, incurred, which was the remediation steps that they chose to take. What Trammel Crow did with the money was its choice. In plain and simply, plaintiff's sales price was reduced by Circle K's contamination, and Circle K, not an innocent third party, should have to pay an amount the jury determines is reasonable. Now, when can an individual testify rather than an expert, right? Because the main issue that you all are deciding is, did the judge, excuse me, the magistrate make a mistake by imposing too exacting a standard in dismissing the case because plaintiffs didn't have an expert in their case-in-chief? So, my clients could certainly have testified to their loss in sales. The LifeWise Master Funding case that we refer to, 2374 F3rd 917, says that an individual owner can testify without an expert if they have personal knowledge of their business and the factors that led to the lost profits, and if the valuation, the loss in this case, is based on a straightforward, common sense calculation. And certainly, my clients were aware of the documents which led to the reduction in their sales price. It was the Third Amendment to the Purchase and then it was the amount reduced from escrow. Nothing could be simpler. And also, my clients had that straightforward calculation. So, they met the requirements under the LifeWise Master Funding test, and they should have been allowed to testify at the trial, which was a mere few weeks away. And yet, the court imposed a standard which even you on the panels you've been with have said is too much. Individuals do not, or cases don't need an expert at every stage. And Judge Baldock, in a case a few years back in 1993, Hertz Corporation v. Gaddis Walker, you said, once a party has established the fact of damages, quote, it's proper to let the jury determine what the loss is from the best evidence the nature of the case admits. So, we know that there was a trespass. That's what the court below found. That's indisputed. The Circle K gas station put benzene under at least a portion of my client's property, and my clients had the ability to testify that they lost sales, and the case should have proceeded on that ground alone. Now, my opponent, Mr. Rackham, is going to argue that an expert was needed to demonstrate that the remediation steps that Trammell Crowe took were reasonable. And our belief is, yes, they can make that argument, and they were going to make it with their expert. And then we had a rebuttal expert lined up. Cat Wilson, who probably knows more about vapor barriers than any expert in the state, was prepared to rebut any of the allegations, or excuse me, any of the testimony that the expert gave on how large a vapor barrier was needed. You may remember from the map I showed you, there was testimony that the contamination didn't cover the entire footprint of the site. Well, if that was the argument that Circle K was going to present in district court, then we had a rebuttal expert ready and primed to respond to that. But what wasn't right was that the magistrate again said that we would have needed an expert in our case-in-chief. Why wasn't it right? It's not right because we had factual experts to demonstrate, one, a trespass, which we obviously did. We met all elements. And two, that what was chosen by Trammell Crowe, the developer, was recommended by numerous remediation experts in this case. There were three remediation experts, CGRS, Family Environmental, a third one I'm forgetting right now. All of those individuals could have testified that there was contamination, that it's customary to put in a vapor barrier. And then Circle K could have put on an expert to say, you know, that vapor barrier isn't sufficient. And then we had Mr. Wilson primed and ready to go to say, yes, yes, it is sufficient. And ultimately, the jury would have determined the extent of the violation. I have seven minutes left. I'd like to turn to another issue for us, and that was, did the district court err? And this one, although I think it's a de novo standard, plain and simply, on that first issue, which damages should have been chosen? I would say that it's an abusive discretion standard on this next issue I'm going to raise, to be candid with you. And that issue was, did the district court err by not letting us bring up the issue of lost opportunity damages? How did it misapply the woodworker factors in your view? There wasn't a trial scheduled. There wasn't prejudice to the defendants. Maybe if you try to maybe the key one is, was there prejudice and could it be cured? And because no trial date was set, because the judge, the magistrate, had already permitted two depositions after the discovery cutoff period, it would have been easy to cure any prejudice. You know, the argument is that we put in the lost opportunity damages on the last day of the discovery period. And it is a strategic decision on the part of litigants as to when you have depositions. And the argument that the court made was that the depositions had already occurred. But in reality, that was a choice that Circle K made. They could have held depositions later. And in fact, there were depositions scheduled, as I said, after the discovery cutoff, and indeed of Mr. Lucero, who would have been questioned about those lost opportunity damages. So I can't say enough is enough. At some point, you know, you let a little bit through just for and then the doors open a little bit and you try to rush in with a bunch of additional damages, which was a substantial increase to the Circle K's exposure. You know, from my clients are the little guys. And so yes, $140,000 additional lost opportunity cost damages, you know, are a big percentage of the total. But the lost damages from the 108 that were taken from the environmental escrow, that was $182,000, $183,000. It didn't expand the scope of the case that much. But the reality is, you know, we look at the woodworker supply factors. Do we shut the door entirely just because my clients put in the calculation of the damages on the last day of discovery? And, you know, we frankly, we met the requirements. We submitted the supplemental disclosure pursuant to the time deadlines to the case management order. And if there was prejudice, it could have been cured. Is it your position, you know, there were there was some additional discovery on other categories of damages. Is it your position that there's really no meaningful difference between discovery or complexity for lost opportunity versus the other categories? In other words, they're functionally equivalent rather than different kind? You know, we, Judge Tinkovich, we had given all of the documents related to lost opportunity damages early in the case. What we did in our tenth supplemental disclosure is we provided a number. We calculated the amount of lost opportunity damages. In hindsight, I probably wouldn't have done it because it did raise the issue that it was late. But the reality is, all of the information related to lost opportunity damages occurred earlier in the case. And all we did was present a final number, which, you know, apparently caused the magistrate to say, yes, we're increasing the complexity of the case significantly. But no, I don't think the complexity of the case was significant. That number was predicated on the additional time it would have taken to close on the purchase and sale because of the contamination. And so, there is a lost opportunity damage associated with that additional extension. Easily something the jury could have dealt with and easily something we could have dealt with in depositions. If I could reserve the remainder of my time for rebuttal, I'd greatly appreciate it. Okay. Let's hear from counsel for Circle K. Good morning, Your Honors. I'm Troy Rackham. I'm counsel for Circle K. May it please the discuss the issue of whether the district court abused its discretion when it ruled that an expert was required to establish proximal causation of damages. And then I'll go to the lay witness issue that the plaintiffs raised. And then finally, I'll discuss the issue of striking that plaintiffs late disclosed or untimely disclosed damages. So, first on the expert requirement, you know, this is a case that arises out of a petroleum spill, gasoline from underground storage tanks. The plaintiff alleged in their complaint that that spill migrated laterally, reached subsurface groundwater under the edges of their property and caused, because it includes benzene, xylenes, and MTBE, which is methyl tertiary butyl ether, caused significant health and environmental risks to the property and to the residents of the property. So, this is not a situation of, you know, a cow crossing a fence where a layperson could identify it. The plaintiffs specifically alleged that these chemicals in the petroleum caused significant environmental and health hazards. So, the core of this case, from the very beginning when they filed their complaint, involved complex questions of environmental science. And although Circle K didn't dispute that the petroleum had been released and that it migrated under the surface through the groundwater, mostly because the expert Circle K had hired, told them that, Circle K disputed the scope of the release, disputed whether the or vapor hazards. And importantly, before the plaintiffs filed suit, five experts had tested and analyzed the contamination. And so, Reza's counsel, you know, held up the piece from the record in the appendix showing a map. That map was based on technical and scientific testing of soil samples in the area done by an expert. These five experts... Reza Sayah, Council, let me ask you this question because we're kind of going through procedural matters that we've kind of read and looked through. I want to get to the first question of why cannot the owner of a business testify, not an expert, as to its lost profit? Sure. You know, there are cases under the LifeWise standard that an owner of a business can testify as to lost profits. If the owner of the business has personal knowledge of those lost profits and it's a simple calculation, this is neither. First of all, the $183,000 that was ultimately spent from the environmental escrow was not spent by the plaintiffs. The plaintiffs didn't control those funds. They didn't authorize how those funds would be spent. They didn't evaluate whether those funds were necessary for the contamination. Those funds were all spent by Trammell Crow in doing the remediation. So, the first standard under the LifeWise doesn't apply because the plaintiffs don't have personal knowledge of those specific funds and how they were spent. They were spent by Trammell Crow's expert to do the remediation. The second was it wasn't a straightforward calculation. It wasn't easy to determine, oh, the $183,000 is for this and this and this, and so we can evaluate those as damages. Even if both of the LifeWise standards were established, they still didn't establish that the remediation expenses that Trammell Crow agreed to pay from this environmental escrow were necessary to resolve the health and environmental risk that they alleged existed from the petroleum contamination. Counsel, can I interrupt you on Mr. Baldock's point, which is to ask, at least what I understand it to be, here's what I'm not following about Circle K's position. It seems to me that Circle K is saying, okay, Sunrisa Ortega, you have a buyer, good for you, and your buyer's paying multi-millions of dollars for this property, but because of our gas bill, and it's only one party's fault, because of our gas bill, your buyer won't buy anymore unless there's this vapor guard. So your choice, Sunrisa and Ortega, is too bad for you, find another buyer that doesn't insist on a vapor guard, and that doesn't seem reasonable to me. In other words, it's not like Sunrisa Ortega is benefiting in some fashion from that vapor guard, all it's doing is getting its original deal, it's continuing the sale of the property to the same dollars of profit or sales volume as if there had not been a gas leak. So is that Circle K's position is you'll just have to reject that buyer and find another one that doesn't require that vapor guard? Circle K's position was the vapor barrier that Terracon had recommended was unnecessary based on the other experts' reports, and indeed, Trammell Crowe's initial expert had said it was unnecessary. But that's not answering my question, and I think it's a fair question that can be answered directly, which is, is Circle K saying to these sellers, we reject your buyer's condition, and so go find another buyer for the same price? Circle K is saying that the buyer's position was for business-related reasons and not caused by the contamination, which Mr. Schilt testified to in his deposition. He said, we wanted to do this extravagant vapor barrier to have a clean package in order to sell the property later, whether it was necessary or not, because it was such a big, you know, they planned on $120 million development, so $300,000 to Trammell Crowe was a very small margin, and it was worth that margin to not have to answer questions later on about, you know, what did you do with any environmental risks if there were any? That was a business decision, and, you know, if Circle K were in that business, in that position to make that business decision, or I were in that position, I very well may make the same business decision, but that doesn't mean that business decision was caused by a need to remediate. It was made because Trammell Crowe wanted a clean package in the event that they ever sold the property in the future. So, I think those are very important points, and that's what the District Court identified in evaluating the approximate causation piece of it under the, under Colorado law, specifically articulating that, you know, that business decision may be perfectly appropriate, but it wouldn't be the approximately caused by the petroleum spill because it was a, it was a decision made for other reasons consistent with, you know, Colorado law, and specifically the malpractice case we cited in the brief. So, and importantly, it was heavily disputed whether any vapor barrier was needed at all. Even the Colorado Division of OPS had indicated that a vapor barrier may not be needed at all. So, this was a question of, you know, did the spill cause health and environmental risks? And you had experts that disagreed on it. It's something that's beyond the can of an ordinary juror, and it's something that would require expert testimony to show that the petroleum spill caused health and environmental risks that needed to be addressed or remediated. And that's how the plaintiff pled their claim from the very beginning. They specifically alleged that the contamination migrate, this is in paragraph 22 of their complaint, migrated onto the impacted properties and created environmental risk and health hazards to the impacted property. So, they're drawing the chain of causation to we need to remediate the property because it caused health risks, and that question whether benzene and these other petroleum contaminants would cause a health risk when it's, you know, hundreds of feet underground through the groundwater was a question that was beyond the can of ordinary jurors and required expert testimony. And, you know, this court has applied a similar standard in the Magnatech case in Mitchell v. GenCorp, which was a case where that Judge Baldock wrote, the court held that proving the level exposure from flammable products such as xylene, hexane, and haptene required expert testimony because the question of whether exposure to those chemicals would be hazardous to human beings at what level and for what length of time required expert testimony. And that's the way the plaintiffs framed their case from the very beginning is that the exposure to these petroleum contaminants and benzene was so significant that it required, that it resulted in health hazards to human beings and therefore needed to be remediated. That was an issue that was disputed, but more importantly, that was an issue that had to be addressed by experts. And the plaintiff conceded that in the scheduling order that they filed, or that was filed, the plaintiffs conceded that they would need an expert environmental consultant or environmental engineer to evaluate those risks, to evaluate the size of the exposure, what would be necessary to address the exposure. They simply didn't disclose one. Mr. Rackham, since there wasn't a trial date and there was going to be further discovery on other categories of damages, what was the prejudice to Circle K? And did the district court really address the woodworker factors adequately on that issue? Yes. I mean, the district court held an extensive hearing and addressed all of the woodwork factors, but let me get to the prejudice. The plaintiffs knew about their damages from the delayed closing in June of 2015, two and a half years before they even filed suit. The trial was set for November of 2019 in that final pretrial conference. The case, at the point the court ruled on this, was already over two years old. There had been hundreds of thousands of dollars incurred in discovery, but as the district court recognized, this theory of lost opportunity costs was based on a theory that had the plaintiffs had the money to begin with, they could have reinvested it in other real estate, and the real estate rose in prices or increased, depriving them of the ability to gain higher profits from reinvesting in that real estate. What was the big deal? Well, because it would require a new round of experts to evaluate the increase in property, as the court identified. Did that happen anyway? I'm sorry? Did that happen anyway? It did not happen. It wouldn't have happened anyway. The court had already denied the plaintiffs the ability to have a diminution of value expert in October of 2018, and then so by February of 2019, when the court's holding this hearing, it's saying, I already denied you the ability to have a diminution of value expert. This kind of expert, looking at real estate property market conditions, would be a new expert with a new round of expert disclosures. Circle K then would have had the right to, and probably would have, hired an expert to respond to that expert, and you would have had additional depositions for the expert discovery in addition to Mr. Lucero. You would have also had, you know, the substantial costs associated with that. And importantly, the district court's decision in applying the woodworkers factors is reviewed for abuse of discretion. So the question is, was there a manifest error in the court's determination that there would be significant prejudice? And respectfully, I don't think there was a manifest error, because the court identified all of this additional work that would be necessary. Well, I couldn't have been cured, and what was the substantial disruption? Sure. I mean, Circle K, from the beginning of the case, had litigated a case that the plaintiff said was worth $183,000. So we applied the proportionality factors and didn't, you know, hire extensive experts to look at damages and that sort of thing. By the time the court's evaluating the woodworkers factors in February of 2019, the plaintiffs had tripled their damages, had completely increased the size of the case. We would have had to start a lot of discovery from scratch. And the idea that the plaintiffs just were providing a calculation at the end of discovery is inaccurate. It was predicated on an inability to use the money for other real estate investments. There were no documents disclosed about what those other real estate investments were, what the increase in prices would have been, and those sorts of things. So we'd had to engage in additional round of discovery in obtaining the documents and that sort of thing. And the plaintiffs knew about this in 2015, and they didn't disclose it until December of 2018, and there was no explanation for that. And so the court applies all of the... Prejudice isn't the only woodworkers factor that the court needed to apply. It applied all of the factors, but it found, based on... With record support that Circle K would be prejudiced if it had to re-engage in discovery on these experts and re... And disclose new experts. So with that, I have three seconds left. Thank you for your time. Counsel, we appreciate it. Mr. Weiner, you have some rebuttal time left. Great. I'll try to make four points. First, Judge Phillips, you have it exactly right. If plaintiffs hadn't agreed to put up to $300,000 in escrow, then the deal would have gone south. Trammell Crowe insisted that the money be put in escrow. Ultimately, $183,000 was taken from escrow, and that's my client's damages. And I disagree with Mr. Rackham's suggestion that my clients didn't have knowledge of that loss. Of course, they had knowledge of the loss. Their check was smaller. It was $183,000 smaller. So of course, they had knowledge of their damages. And once again, it was a straightforward calculation. This clearly falls within the two-part test of LifeWise Master Funding. There was a statement that Ms. Frazier said the vapor barrier wasn't needed. Ultimately, Ms. Frazier was under a misimpression that there were no residential units on grade at this trial. The jury could have heard testimony and fettered out the truth of the situation, and Ms. Frazier would have reversed herself and actually said, oh, yeah, the residential units aren't great. You need a vapor barrier. Going to the woodworker's supply factors, Judge Timkovich, that you were focused on, no trial date was set. You're absolutely right. Matters could have been cured. And then we hear Mr. Rackham say, well, we need a new expert. New experts would have been in new reports. What we're finding in this case and lots of cases is frequently a defendant who's well-heeled says, we need an expert for every facet of the case. To show lost opportunity damages wouldn't require an expert. There's that wonderful case from Judge Martinez, Olivero v. Trek Bicycle, 291 F. Subsecond 1209 from the District Court of Colorado, which says the best evidence isn't always an expert. Sometimes the best evidence is documents. There are cases which say an expert probably isn't the best evidence because experts tend to sway a jury more than factual determinations do frequently. So, no, please don't get sucked into the notion that we would have needed a whole new round of experts, a whole new round of reports on this $140,000 in damages. It's not three times the damages. The lost opportunity cost damages were only 140,000. Yes, it was a lot more, but it's not something so incredible that the synthesis of the woodworker's supply factors, specifically no prejudice, shouldn't rule the day on this issue. Thank you so much for your time, your honors. Your time's expired. We appreciate the arguments, counsel. I think we understand your positions. The case will be submitted and counsel are excused.